## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
─────────────────────────────────────────x
GUSTAVO BRUCKNER, Derivatively on Behalf of  :   Civil Action No. 1:03cv12483 (MEL)
the MFS CAPITAL OPPORTUNITIES FUND,          :
THE MASSACHUSETTS INVESTOR TRUST and         :   Related Actions:
the "MFS FUNDS,"                             :          1:03cv12500 (WGY)
                                             :          1:03cv12515 (MEL)
                          Plaintiff,         :          1:03cv12536 (WGY)
                                             :          1:03cv12545 (WGY)
                                             :          1:03cv12570 (WGY)
             vs.                             :          1:03cv12595 (MEL)
                                             :          1:03cv12622 (WGY)
MASSACHUSETTS FINANCIAL SERVICES             :          1:04cv10009 (RGS)
COMPANY; SUN LIFE FINANCIAL INC.; JOHN       :          1:04cv10010 (MES)
W. BALLEN; JEFFREY L. SHAMES; KEVIN R.       :
PARKE; LAWRENCE H. COHN; WILLIAM R.          :
GUTOW; J. ATWOOD IVES; ABBY M. O'NEILL;      :
LAWRENCE T. PERERA; WILLIAM J. POORVU;       :
J. DALE SHERRATT; ELAINE R. SMITH; WARD      :
SMITH; JOHN DOES 1-50; JOHN DOES 51-100;     :
MFS CAPITAL OPPORTUNITIES FUND;              :
MASSACHUSETTS INVESTOR TRUST; "MFS           :
FUNDS,"                                      :
                                             :
                          Defendant.         :
─────────────────────────────────────────x
```

**[Caption continues on next page]**

### MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
### OF THE MFS FUNDS LEAD PLAINTIFF MOVANTS FOR
### CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, APPOINTMENT
### OF STEERING COMMITTEE, AND APPROVAL OF SELECTION OF LEAD
### COUNSEL, COORDINATING COUNSEL, AND LIAISON COUNSEL

| | | |
|---|---|---|
| OLIVER S. TRONE, Individually and On Behalf of All Others Similarly Situated, | : | Civil Action No.: 1:03cv12514 (WGY) |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| MFS CAPITAL OPPORTUNITIES FUND; MFS CORE GROWTH FUND; MFS EMERGING GROWTH FUND; MFS GROWTH OPPORTUNITIES FUND; MFS LARGE CAP GROWTH FUND; MFS MANAGED SECTORS FUND; MFS MID CAP GROWTH FUND; MFS NEW DISCOVERY FUND; MFS NEW ENDEAVOR FUND; MFS RESEARCH FUND; MFS STRATEGIC GROWTH FUND; MFS TECHNOLOGY FUND; MASSACHUSETTS INVESTORS GROWTH STOCK; MFS MID CAP VALUE FUND; MFS RESEARCH GROWTH AND INCOME FUND; MFS STRATEGIC VALUE FUND; MFS TOTAL RETURN FUND; MFS UNION STANDARD EQUITY FUND; MFS UTILITIES FUND; MFS VALUE FUND; MASSACHUSETTS INVESTORS TRUST; MFS AGGRESSIVE GROWTH ALLOCATION FUND; MFS CONSERVATIVE ALLOCATION FUND; MFS GROWTH ALLOCATION FUND; MFS MODERATE ALLOCATION FUND; MFS BOND FUND; MFS EMERGING MARKETS DEBT FUND; MFS GOVERNMENT LIMITED MATURITY FUND; MFS GOVERNMENT MORTGAGE FUND; MFS GOVERNMENT SECURITIES FUND; MFS HIGH INCOME FUND; MFS HIGH YIELD OPPORTUNITIES FUND; MFS INTERMEDIATE INVESTMENT GRADE BOND FUND; MFS LIMITED MATURITY FUND; MFS RESEARCH BOND FUND; MFS STRATEGIC INCOME FUND; MFS ALABAMA MUNICIPAL BOND FUND; MFS ARKANSAS MUNICIPAL BOND FUND; MFS CALIFORNIA MUNICIPAL BOND FUND; MFS FLORIDA MUNICIPAL BOND FUND; | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |

**[Caption continues on next page]**

MFS GEORGIA MUNICIPAL BOND FUND; MFS      :
MARYLAND MUNICIPAL BOND FUND; MFS         :
MASSACHUSETTS MUNICIPAL BOND FUND;        :
MFS MISSISSIPPI MUNICIPAL BOND FUND;      :
MFS MUNICIPAL BOND FUND; MFS              :
MUNICIPAL LIMITED MATURITY FUND; MFS      :
NEW YORK MUNICIPAL BOND FUND; MFS         :
NORTH CAROLINA MUNICIPAL BOND FUND;       :
MFS PENNSYLVANIA MUNICIPAL BOND           :
FUND; MFS SOUTH CAROLINA MUNICIPAL        :
BOND FUND; MFS TENNESSEE MUNICIPAL        :
BOND FUND; MFS VIRGINIA MUNICIPAL         :
BOND FUND; MFS WEST VIRGINIA              :
MUNICIPAL BOND FUND; MFS EMERGING         :
MARKETS EQUITY FUND; MFS GLOBAL           :
EQUITY FUND; MFS GLOBAL GROWTH            :
FUND; MFS GLOBAL TOTAL RETURN FUND;       :
MFS INTERNATIONAL GROWTH FUND; MFS        :
INTERNATIONAL NEW DISCOVERY FUND;         :
MFS INTERNATIONAL VALUE FUND; MFS         :
RESEARCH INTERNATIONAL FUND; MFS          :
CASH RESERVE FUND; MFS GOVERNMENT         :
MONEY MARKET FUND; MFS MONEY              :
MARKET FUND (collectively known as "MFS   :
FUNDS"); MFS MUNICIPAL SERIES TRUST;      :
MFS SERIES TRUST I; MFS SERIES TRUST II;  :
MFS SERIES TRUST III; MFS SERIES TRUST IV; :
MFS SERIES TRUST V; MFS SERIES TRUST VI;  :
MFS SERIES TRUST VII; MFS SERIES TRUST    :
VIII; MFS SERIES TRUST IX; MFS SERIES     :
TRUST X; AND MFS SERIES TRUST XI          :
(collectively known as the "MFS FUNDS     :
REGISTRANTS"); SUN LIFE FINANCIAL INC.;   :
MASSACHUSETTS FINANCIAL SERVICES          :
COMPANY (d/b/a "MFS INVESTMENT            :
MANAGEMENT"); and JOHN DOES 1-100,        :
                                          :
                            Defendants.   :
————————————————————————————————x

The MFS Funds Lead Plaintiff Movants, as defined below ("Movants"), hereby move this

Court for entry of an order: (i) consolidating the above-captioned actions (the "Massachusetts

Actions"); (ii) appointing the MFS Funds Lead Plaintiff Movants as Lead Plaintiff pursuant to

the Private Securities Litigation Reform Act of 1995 (the "PSLRA") with respect to all claims

brought under the Securities Exchange Act of 1934 and the Securities Act of 1933 (collectively,

the "Massachusetts PSLRA Claims"); (iii) approving the MFS Funds Lead Plaintiff Movants'

designation of a steering committee comprised of class members Lauren Taylor, as trustee of the

French & Associates 401(K) Profit Sharing Plan, Curt Conklin, Oliver S. Trone, individually,

and as trustee of the Trone Advertising Inc. 401(K) Plan, and Aureliano Vignati to represent the

MFS Funds Lead Plaintiff Movants as Lead Plaintiff; (iv) approving the MFS Funds Lead

Plaintiff Movants' selection of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"),

pursuant to the PSLRA, as Lead Counsel of the PSLRA Claims, and as Coordinating Counsel

with respect to the PSLRA Claims, and all other claims asserted in the above-captioned actions

(the "Massachusetts Non-PSLRA Claims") (collectively, with the PSLRA Claims, the

"Massachusetts Claims"); and (v) appointing the MFS Funds Lead Plaintiff Movants' selection

of Moulton & Gans, P.C. ("Moulton & Gans") as Liaison Counsel.[1]

## INTRODUCTION

As of February 6, 2004 there were eleven related actions pending in this District on

behalf of a class of purchasers of units of one or more of the MFS Funds (as defined in the

caption of this filing) during various class periods, beginning as early as December 15, 1998 and

ending as late as December 8, 2003 (the "Class Periods"), or on behalf of one or more MFS

Funds (collectively, the "Massachusetts Actions"). The Massachusetts Actions allege a variety

of claims which the MFS Funds Lead Plaintiff Movants have divided into two categories for the

purpose of presentation to the Court for determination of this motion. One category of claims,

---

[1] The MFS Funds Lead Plaintiff Movants have simultaneously filed a Notice of Filing of the Motion in the Southern District of New York where two related MFS Actions are pending, incorporating this Motion by reference as if filed therein.

the Massachusetts PSLRA Claims, allege violations of §§ 11 and 15 of the Securities Act of

1933 (the "Securities Act"), 15 U.S.C. §§ 77(k) and (o); §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and

Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

The other category of claims, the Massachusetts Non-PSLRA Claims, allege violations of § 206

of the Investment Advisers Act of 1940, 15 U.S.C. §80b-15; §§ 34 and 36 of the Investment

Company Act of 1940, 15 U.S.C. §80a-33 and a-35, and state law claims including breach of

fiduciary duties, aiding and abetting, civil conspiracy, and common law fraud.[2]

## **FACTUAL BACKGROUND**[3]

Mutual funds are meant to be long-term investments and are therefore the favored

savings vehicles for many Americans' retirement and college funds.  Unbeknownst to investors,

from at least as early as December 15, 1998 and until as late as December 8, 2003, defendants

engaged in fraudulent and wrongful schemes that enabled certain favored investors to reap many

millions of dollars in profit, at the expense of MFS Funds' investors through secret and wrongful

timed trading.  In exchange for allowing and facilitating this improper conduct, the "Fund

Defendants" received substantial fees and other remuneration for themselves and their affiliates

to the detriment of Movants who knew nothing of these illicit arrangements.[4]  The complaints

---

[2] Actions against the same or similar defendants and containing the same or similar allegations are pending in the Southern District of New York.  These actions, collectively with the Massachusetts Actions, are referred to herein as the "MFS Actions."  *See* Exhibit A (a complete list of the MFS Actions, including the Massachusetts Actions) and Exhibit B (schedule of MFS Actions by claims).  These Exhibit references and all others herein (unless otherwise indicated) refer to the documents attached to the Declaration of Nancy F. Gans in Support of the Motion of the MFS Funds Lead Plaintiff Movants for Consolidation, Appointment as Lead Plaintiff, Appointment of Steering Committee, And Approval of Selection of Lead Counsel, Coordinating Counsel, and Liaison Counsel, submitted contemporaneously herewith (the "Gans Decl.").

[3] These facts are drawn from the allegations in the complaint captioned *Trone v. MFS Capital Opportunities Funds*, No. 03-cv-12514 (D. Mass. Filed on Dec. 15, 2003) (Young, J.) (the "*Trone* Complaint").

[4] The "Fund Defendants" are Sun Life Financial Inc., MFS Company, the MFS family of mutual funds and each of their registrants.

allege that Massachusetts Financial Services Company ("MFS Company"), as manager of the MFS Funds, and each of the relevant fund managers, profited from fees MFS Company charged to the MFS Funds that were measured as a percentage of the funds under management. In exchange for the right to engage in wrongful timing, the John Doe Defendants agreed to park substantial assets in MFS Funds. Furthermore, the John Doe Defendants secretly disguised additional, improper compensation to the Fund Defendants as interest payments on monies loaned by the Fund Defendants to the John Doe Defendants for the purpose of financing the illegal scheme.

"Timing" is an arbitrage strategy involving short-term trading that can be used to profit from mutual funds' use of "stale" prices to calculate the value of securities held in the funds' portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese securities. Because of the time zone difference, the Japanese market may close at 2 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese securities in his or her fund to arrive at an NAV at 4 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect that increase, and the fund's NAV will be artificially low. Put another way, the NAV would not reflect the true current market value of the stocks the fund holds.

Effective timing captures an arbitrage profit that comes dollar-for-dollar out of the fund; the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the

4

timer sells short on bad days, the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the depressed returns that investors are experiencing in a declining market.

On September 4, 2003 *The Wall Street Journal* reported that the New York Attorney General Elliot Spitzer had filed a complaint in New York Supreme Court alleging that certain mutual fund companies secretly allowed, and in some instances facilitated, a New Jersey-based hedge fund to engage in prohibited and/or fraudulent trading in mutual fund shares (the "Spitzer Complaint"). In return for this favored treatment, which damaged the long-term mutual fund investors, the hedge fund parked funds in financial instruments controlled by the fund companies or their affiliates to increase fund management fees, and entered into other arrangements which benefited the fund companies and/or their affiliates.

The Spitzer Complaint received substantial press coverage and sparked additional investigations by state agencies, the SEC and the U.S. Attorney for the Southern District of New York, and led to calls for more regulation and tougher enforcement of the mutual and hedge fund industries. On September 5, 2003, *The Wall Street Journal* reported that the New York Attorney General's Office had subpoenaed "a large number of hedge funds" and mutual funds as part of its investigation, "underscoring concern among investors that the improper trading of mutual-fund shares could be widespread" and that the SEC, joining the investigation, planned to send letters to mutual funds holding about 75% of assets under management in the U.S. to inquire about their practices with respect to market-timing and fund-trading practices.

On December 8, 2003, before the market opened, Sun Life issued a press release over *PR Newswire* announcing that the Boston office of the SEC intended to recommend to the SEC that

an enforcement action be brought against MFS Company. In the release, Sun Life stated in

relevant part, as follows:

> Sun Life Financial Inc. today said that the staff of the Boston
> office of the Securities and Exchange Commission (SEC) has
> indicated that it intends to recommend to the SEC that an
> enforcement action be taken against Massachusetts Financial
> Services Company (MFS) alleging, in effect, that the disclosure in
> certain of MFS' fund prospectuses concerning market timing was
> false and misleading, and breach of fiduciary duty.
>
> The SEC notice contains no allegations that any MFS employee
> was knowingly involved in either late trading or inappropriate
> personal trading in MFS funds.

On the same day, MFS Company sent a letter to MFS Funds shareholders, which was

posted on MFS Company's website, in which defendants admitted that they did not monitor

trading in eleven MFS Funds for timed and late-trading, contending that such activity was not

harmful. The letter stated, in relevant part, as follows:

> To Our Valued Clients:
>
> As you may have heard, MFS has been informed that the staff of
> the Boston office of the Securities and Exchange Commission
> (SEC) intends to recommend to the SEC that a civil enforcement
> action be brought against MFS alleging, in effect, that the
> disclosure in certain of MFS' fund prospectuses concerning market
> timing was false and misleading, and breach of fiduciary duty.
>
> We are cooperating fully with the SEC and want to make sure you
> have a clear understanding of this situation and MFS' procedures
> designed to prevent excessive trading from disrupting portfolio
> management and harming fund performance.
>
> First, it is important to note that the SEC notice contains no
> allegations that any MFS employee was knowingly involved in
> either late trading or inappropriate personal trading in MFS funds.
>
> With respect to market timing, there has been much coverage in
> the media of investors who seek to trade rapidly in and out of a
> mutual fund in order to capture profits by exploiting pricing
> inefficiencies between the fund's shares and the value of the

6

underlying securities in the portfolio. This could happen, for example, in international funds, where time zone differences between markets create opportunities to profit from arbitrage based on 'stale' prices. It can also occur in funds composed of thinly traded asset classes, such as high-yield bonds, and in small-cap stocks, where sudden large cash flows can have an immediate impact on prices.

MFS monitored trading in these types of funds daily to prevent harm to fund performance and disruption to portfolio management. MFS identified and cancelled millions of dollars of trades that MFS believed could harm fund performance and disrupt portfolio management, and also used fair value pricing of portfolio securities to lessen the attraction of these funds to market timers.

***Until recently, MFS did not monitor daily the trading activity in 11 domestic large-cap stock and high-grade bond funds. MFS believed that daily monitoring with respect to these large and highly liquid funds was unnecessary because MFS concluded that frequent trading in these funds would not be disruptive to portfolio management and harm fund performance. In MFS' judgment, pricing inefficiencies do not exist in these large, highly liquid funds.***

Nevertheless, as the mutual fund industry moves to further restrict frequent trading, MFS has decided to monitor trading activity in these 11 funds. MFS now has exchange limits on all 105 funds in the MFS fund family. [Emphasis added.]

On December 9, 2003, *The Wall Street Journal* reported that MFS Company had established an undisclosed policy, contradicting its public statements to MFS Funds shareholders, that permitted market timing in its funds. The article stated, in relevant part, as follows:

SEC investigators believe such a written, internal policy was used by MFS to increase its assets under management -- and consequently its fees -- by attracting investments at a time when its overall business was declining in a bear market, according to people familiar with the matter. Federal investigators believe senior managers at MFS were aware of the policy, these people said.

* * *

7

Massachusetts securities regulators are also investigating MFS related to testimony from brokers at the former Prudential Securities that an MFS employee told them that certain funds could be market-timed, despite the prospectuses. . .

*The funds that MFS allowed to be timed included MFS Emerging Growth Fund. . . . But the Emerging Growth Fund's prospectus states: "The MFS funds do not permit market-timing or other excessive trading practices that may disrupt portfolio management strategies and harm fund performance."* [Emphasis added.]

## ARGUMENT

## POINT I

### THE ACTIONS SHOULD BE CONSOLIDATED

Consolidation is appropriate when there is "a common question of law or fact pending before the Court." Fed. R. Civ. P. 42(a). *See New England Energy, Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 7-8 (1st Cir. 1988) (consolidation of cases alleging common facts and law appropriate under state consolidation statute based upon Fed. R. Civ. P. 42(a), *cert. denied* 489 U.S. 1077 (1989)); *In re PRI Automation, Inc. Secs. Litig.*, 145 F. Supp. 2d 138, 140 (D. Mass. 2001) (Keeton, J.).

The standard under Rule 42(a) is clearly met here. Each complaint alleges that defendants engaged in unlawful and deceitful "market timing" activity involving MFS Funds that enabled favored investors to reap millions of dollars in profits. The complaints also each allege that, in exchange for allowing and facilitating this misconduct, the Fund Defendants received substantial fees from so-called "sticky assets", which the John Doe Defendants agreed to park in the MFS Funds, and that the ill- gotten gains came dollar for dollar out of the pockets of ordinary long-term investors, and imposed significant unnecessary transaction costs. The similarities between the Massachusetts Actions is evidenced in the following excerpt from the *Trone* Action,

alleging violations of the Securities Act, the Exchange Act, and the Investment Advisers Act,

which also appears, in large part, in the other MFS Funds-related complaints filed in this District:

> In exchange for allowing and facilitating this improper conduct,
> the Fund Defendants received substantial fees and other
> remuneration for themselves and their affiliates to the detriment of
> plaintiff and other members of the Class who knew nothing of
> these illicit arrangements. Specifically, MFS Company, as
> manager of the MFS Funds, and each of the relevant fund
> managers, profited from fees MFS Company charged to the MFS
> Funds that were measured as a percentage of the fees under
> management. In exchange for the right to engage in timing, which
> hurt plaintiff and other Class members, materially and negatively
> affecting the value of the MFS Funds, the John Doe Defendants
> agreed to park substantial assets in the Funds, thereby increasing
> the assets under MFS Funds' management and the fees paid to
> MFS Funds' managers. The assets parked in the MFS Funds in
> exchange for the right to engage in timing have been referred to as
> "sticky assets." The synergy between the Fund Defendants and the
> John Doe Defendants hinged on ordinary investors' misplaced trust
> in the integrity of mutual fund companies and allowed defendants
> to profit handsomely at the expense of plaintiff and other members
> of the Class.

*Trone v. MFS Capital Opportunities Fund*, No. 03-CV-12514 (D. Mass. filed on Dec. 15, 2003)

(Young, J.) (Complaint, at ¶ 22).[5]

Given that the Massachusetts Actions contain the same or similar defendants, overlapping

allegations and common questions of fact, the standards for consolidating the Actions pursuant to

Fed R. Civ. 42(a) are clearly met, regardless of the legal theories advanced by plaintiffs. Plainly,

consolidation for pretrial purposes under these circumstances will save judicial and private

resources, and will promote efficiency and consistency in the prosecution of these Actions.

---

[5] *Compare, e.g., Bruckner v. Massachusetts Financial Services Co.*, No. 03-CV-12483 (Lasker, J.) (Complaint at ¶¶
32-38) (alleging nearly identical facts as *Trone* Complaint); *Riggs v. Massachusetts Financial Services Company*,
No. 03-cv-12500 (D. Mass. filed on Dec. 11, 2003) (Young, J.) (Complaint at ¶¶ 31-35) (same); *Greenberg v.
Massachusetts Financial Services Company*, No. 03-CV-12545 (D. Mass. filed on Dec. 18, 2003) (Young, J.)
(Complaint at ¶¶ 26-32) (same); and *Feldman v. Massachusetts Financial Services Company*, No. 04-CV-10009 (D.
Mass. filed on Jan. 3, 2004) (Stearns, J.) (Complaint at ¶¶ 21-25) (same).

9

## POINT II

## THE MFS FUNDS LEAD PLAINTIFF MOVANTS
## SHOULD BE APPOINTED LEAD PLAINTIFF

The MFS Funds Lead Plaintiff Movants should be appointed lead plaintiff because they have the largest financial interest in this litigation and otherwise meet the relevant requirements of Fed. R. Civ. P. 23. Moreover, Movants have proposed a leadership structure that makes the most sense for this litigation and which is fully consistent with the requirements and underlying purpose of the PSLRA. Courts have held that, ideally, a lead plaintiff group should be cohesive enough to ensure adequate cooperation among its members in the management of the action, yet should also reflect the diversity of the class it seeks to represent. *See generally In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42 (S.D.N.Y. 1998) (holding that the combination of an institutional investor and an individual would be most representative of the class, composed of individual and institutional investors); *In re Universal Access, Inc.*, 209 F.R.D. 379, 384 (E.D. Tex. 2002) ("the appointment of a group of persons to act as lead plaintiff is appropriate under the PSLRA and, indeed, is sometimes favored in light of the ***diversity of experience and interests of the group members***.") (emphasis added.) Movants meet the criteria of cohesiveness and diversity. Movants are comprised of class members who purchased shares in at least twenty-three different funds within the MFS family of funds, and thus are more representative of the class than any other movant(s).[6] Moreover, the MFS Funds Lead Plaintiff Steering Committee is

---

[6] As is discussed more fully below, these actions are different from the typical PSLRA action in several ways, including that the class is comprised of investors numerous funds in the MFS family of mutual funds. For this reason, an effort has been made to put forth as lead plaintiff investors from as many of the funds as possible. Consequently, the number of lead plaintiff movants is correspondingly greater than the ordinary PSLRA action, which is typically brought against a single company.

comprised of five members of the MFS Funds Lead Plaintiff Movants and is unquestionably a small, cohesive unit that can easily and ably coordinate their efforts.[7]

## A.   The Procedure Required By the PSLRA

The PSLRA establishes a procedure that governs the appointment of a Lead Plaintiff in "each private action arising under the [Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §§ 78u-4(a)(1) and (a)(3)(B)(i). First, the plaintiff who files the initial action must publish a notice to the class, within 20 days of filing the action, informing class members of their right to file a motion for appointment as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Plaintiff in the action *Riggs v. Massachusetts Financial Services Company*, No. 03-CV-125000, filed in this District on December 11, 2003, caused notice to be published on *PR Newswire* on the same day. *See* Exhibit D. Within 60 days of publishing the notice, any person or group of persons who are members of the proposed class may apply to the Court to be appointed as Lead Plaintiff, whether or not they have previously filed a complaint in the action. 15 U.S.C. § 78u-4(a)(3)(A) and (B). Second, the PSLRA provides that within 90 days after publication of the notice the Court shall consider any motion made by a class member and shall appoint as Lead Plaintiff the member or members of the class that the Court determines to be most capable of adequately representing the interests of class members. 15 U.S.C. § 78u-4(a)(3)(B). In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this Act is the person or group of persons that:
>
> (aa)   has either filed the complaint or made a motion in response to a notice. . .

---

[7] A complete list of the MFS Funds Lead Plaintiff Movants is set forth in Exhibit C.

(bb)    in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc)    otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. 78u-4(a)(3)(B)(iii). *See generally Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 64

(D. Mass. 1996).

## B.    Movants Satisfy The "Lead Plaintiff" Requirements Of The PSLRA

### 1.    Movants Have Complied With the PSLRA and Should Be Appointed Lead Plaintiff

The time period in which class members may move to be appointed Lead Plaintiff in this case, under 15 U.S.C. § 78u-4(a)(3)(A) and (B), expires on February 9, 2004. Movants' application is thus timely. Movants have reviewed the complaint and are willing to serve as representative parties on behalf of the Class. *See* Exhibit E.[8] In addition, Movants have selected and retained competent counsel to represent them and the Class. *See* Exhibit F. Accordingly, Movants have satisfied the individual requirements of 15 U.S.C. § 78u-4(a)(3)(B) and are entitled to have their application for appointment as Lead Plaintiff, and their selection of Milberg Weiss as Lead Counsel and Moulton & Gans as Liaison Counsel approved by the Court.

### 2.    Movants Have the Requisite Financial Interest In The Relief Sought By The Class

In securities cases brought pursuant to the PSLRA, the relative financial interest of lead plaintiff movants is typically measured by the difference between the class-period purchase price of the securities on the one hand, and sale price of the securities subsequent to disclosure of defendants' materially false and misleading statements on the other.[9] These cases are different

---

[8] Exhibit E contains the certification of each of the MFS Funds Lead Plaintiff Movants, filed pursuant to the PSLRA, setting forth their relevant class period transactions in MFS Funds.

[9] *See Lax v. First Merchants*, 1997 U.S. Dist. LEXIS 11866 at *17 (N.D. Ill. Aug. 6, 1997) ('The PSLRA does not state how the court should determine who has the largest financial interest, but four factors are surely relevant: (1)

because the gravamen of plaintiffs' allegations is that defendants failed to disclose that they improperly siphoned money out of the MFS Funds through timed trading, and excessive fees, thereby decreasing the actual NAV of the funds. In these cases, investors were harmed, not only because they purchased the MFS Fund units at artificially inflated prices, without knowledge of this pattern and practice, but also because, once having invested their money in MFS Funds, unbeknownst to them, their money was improperly removed throughout the course of the class period as defendants profited from their timed trading.

Consequently, the typical PSLRA financial interest analysis may not be workable or appropriate in these cases. Recognizing this, Movants retained KeyPoint Consulting LLC ("KeyPoint") to devise and implement a methodology for determining relative financial interest in this litigation. KeyPoint is a nationally renowned economic and financial consulting firm with offices in Los Angeles, Houston, and Emeryville, California. The firm provides research and consulting services primarily in the areas of antitrust, banking and finance, commercial damages, forensic accounting, intellectual property and regulation. Movants submit herewith as Exhibit G the Declaration of Marc Vellrath, Ph. D., CFA dated February 9, 2003 ("Vellrath Decl."). Vellrath is an economist and KeyPoint Principal. *See* Vellrath Decl. at ¶1.

According to Vellrath, one can quantify an investor's "exposure" by calculating the shareholder's "dollar days of holdings," or, equivalently, the shareholder's "average dollar holdings" for a typical day during the class period. A "dollar day of holdings" in a mutual fund is simply one dollar invested in the fund for one day. For example, if an investor held \$1,000 in fund ABC for 500 days during the class period, that investor had 500,000 dollar days of holdings in ABC fund during the class period. Therefore, an investor's "average dollar holdings" is the

_____

the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs).

13

dollar value of his or her holdings on average each day during the class period calculated by dividing his or her total "dollar days of holdings" by the number of days in the class period.[10] As set forth in the Vellrath Declaration, this measure of financial interest is appropriate here because the longer an investor owns shares of a fund that permits improper trading, the more likely that he or she would suffer losses because of this misconduct. In particular, for a group of investors who purchased mutual fund shares during the class period, the harm suffered by those investors would most likely be, at a minimum, proportionate to both their dollar days of holdings and their average dollar holdings. *See id.* at ¶¶ 8-15.

Movants' average dollar holdings are $4,529,661 and the MFS Funds Lead Plaintiff Movants' Steering Committee's average dollar holdings are $3,395,582. *See* Vellrath Dec. at ¶16. To our knowledge, this represents the largest financial interest of any competing lead plaintiff movant.

### 3.    Movants Otherwise Satisfy Rule 23

According to 15 U.S.C. § 78u-4(a)(3)(B), in addition to possessing the largest financial interest in the outcome of the litigation, the Lead Plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See e.g. Singer v. Nicor*, 2002 U.S. Dist. LEXIS 19884 (N.D. Ill. Oct. 17, 2002). Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

---

[10] Continuing with the previous example, if the class period were 1,000 days, the investor who had 500,000 dollar-days of holdings in ABC fund during the same period had average dollar holdings of $500 each.

Of the four prerequisites to class certification, only two, typicality and adequacy, directly address the personal characteristics of the class representative. Consequently, in deciding a motion to serve as Lead Plaintiff, the Court should limit its inquiry to the typicality and adequacy prongs of Rule 23(a), and defer examination of the remaining requirements until the Lead Plaintiff moves for class certification. *Lax*, 1997 U.S. Dist. LEXIS 11866, at *20; *Fischler v. Amsouth Bancorporation*, No. 96-1567-Civ -T-17A, 1997 U.S. Dist. LEXIS 2875, at *7-8 (M.D. Fla. Feb. 6, 1997). The MFS Funds Lead Plaintiff Movants should be appointed Lead Plaintiff because they satisfy the typicality and adequacy requirements of Rule 23.

Under Rule 23(a)(3), the claims or defenses of the representative parties must be typical of those of the class. Typicality exists where the plaintiffs' claims arise from the same series of events and are based on the same legal theories as the claims of all the class members. *See De La Fuente v. Stokley-VanCamp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) and *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986). Typicality does not require that there be no factual differences between the class representatives and the class members because it is the generalized nature of the claims asserted which determines whether the class representatives are typical. *See Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) ("With respect to typicality under Rule 23(a)(3), plaintiffs need not show substantial identity between their claims and those of absent class members, but need only show that their claims arise from the same course of conduct that gave rise to the claims of the absent [class] members.") (citations omitted). The requirement that the proposed class representatives' claims be typical of the claims of the class does not mean, however, that the claims must be identical. *See In re Great Southern Life Insurance Company Sales Practices Litigation*, 192 F.R.D. 212, 217 (N.D. Tex. 2000) (citing *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d

1014, 1024 (5th Cir. 1981)). Movants satisfy this requirement because, just like all other class members, they: (1) purchased MFS Funds units during the Class Period; (2) purchased MFS Funds units in reliance upon the allegedly materially false and misleading statements issued by defendants and the integrity of the market for the units; and (3) suffered damages as a result of market timing. Thus, Movants' claims are typical of those of other Class members since their claims and the claims of other Class members arise out of the same course of events.

Under Rule 23(a)(4), the representative parties must also "fairly and adequately protect the interests of the class." The PSLRA directs the Court to limit its inquiry regarding the adequacy of movants to represent the Class to the existence of any conflicts between the interest of those movants and the members of the Class. The standard for adequacy of representation under Rule 23(a)(4) is met by: (1) the absence of potential conflicts between the named plaintiffs and the class members and (2) the class representatives' choice of counsel who is qualified, experienced and able to vigorously conduct the proposed litigation. *See Modell v. Eliot Sav. Bank*, 139 F.R.D. 17, 23 (D. Mass. 1991) (*citing Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (lst Cir. 1985)).

Here, Movants are an adequate representative of the Class. Their interests are aligned with the interests of the Class because they all purchased MFS Funds units pursuant to materially false and misleading statements. Furthermore, there is no evidence of antagonism between Movant and the Class. In addition, as shown below, Movants' proposed Lead Counsel is highly qualified, experienced and able to conduct this complex litigation in a professional manner. Thus, Movants *prima facie* satisfies the commonality, typicality and adequacy requirements of Rule 23 for the purposes of this motion.

## POINT III

### MILBERG WEISS SHOULD BE APPOINTED AS LEAD COUNSEL OF THE PSLRA CLAIMS AND COORDINATING COUNSEL OF THE MASSACHUSETTS CLAIMS AND MOULTON & GANS SHOULD BE APPOINTED LIAISON COUNSEL FOR THE CLASS

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), Movant shall, subject to Court approval, select and retain counsel to represent the class he seeks to represent. In that regard, Movant has selected Milberg Weiss to serve as Lead Counsel and Moulton & Gans to serve as Liaison Counsel. Milberg Weiss and Moulton & Gans have substantial experience in the prosecution of shareholder and securities class actions, and has the resources necessary to efficiently conduct this litigation. *See* Exhibits F and G. Accordingly, the Court should approve Movants' selection of Lead Counsel and Liaison Counsel.

Milberg Weiss should also be appointed coordinating counsel of the Massachusetts Actions. Given the multiplicity of claims presented by the Massachusetts Actions and the possibility that numerous other MFS-related actions will be centralized in this District, the appointment of Coordinating Counsel is necessary to avoid chaos and to ensure efficient management of the litigation. *The Manual for Complex Litigation* cautions that without coordination, complex litigations raising similar issues and involving numerous parties and separate counsel can result in a "waste of time and money, in confusion and indirection, and in unnecessary burden on the court." *Manual for Complex Litigation*, 3d Ed. at 36 (2003). In order to avoid these unwanted results, the Manual advises that "special procedures for coordination of counsel are therefore needed and should be instituted early in the litigation to avoid unnecessary costs and duplicative activity." *Id.*

17

The Massachusetts Actions are precisely the type of complex multiparty litigation that will benefit from the appointment of Coordinating Counsel. As detailed in Point I above, there are three INVESCO -related actions in this District, and nine in other districts. The various actions assert a plethora of claims. Yet the various actions allege essentially the same facts, namely, that defendants engaged in a scheme whereby certain privileged investors improperly traded mutual fund shares to the detriment of ordinary investors. The potential for unnecessary duplication and inefficiency is therefore present under these circumstances and, accordingly, the appointment of Coordinating Counsel is appropriate. *See Manual for Complex Litigation*, 3d Ed. at 36-37 (2003).

Once appointed, in order to the enable the efficient prosecution of the Massachusetts Actions, Coordinating Counsel should have the responsibility and authority to, among other things, "coordinate with all other plaintiffs' counsel to reach agreements on briefing schedules, number and lengths of briefs, and other matters that concern the core issues involved in all or most of the now consolidated cases." *Baystate Health Sys. v. Thompson*, 254 F. Supp. 2d 80, 82 (D. D.C. 2003). *See In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F. Supp. 445, 475 n. 66 (E.D. Penn. 1995) ("In this capacity, [Coordinating Counsel] coordinated all court filings and discovery, and generally coordinated the litigation process to ensure that required tasks were performed. With respect to pretrial preparation, trial, and settlement, [Coordinating Counsel] shared strategic decision-making with [other counsel].").

Milberg Weiss is uniquely qualified to act as Coordinating Counsel by virtue of its resources, experience and track record in the area of class action litigation. Indeed, Milberg Weiss has spearheaded some of the largest and most complex class actions in history, such as *In re NASDAQ Market-Makers Antitrust Litig.* Civ 3996 (S.D.N.Y.), *In re Initial Public Offering*

18

*Sec. Litig., Master File* No. 21 MC 92 (S.D.N.Y.), and *In re Enron Corp., Sec. Litig.*, No. H-01-3624 (S.D. Tex.). Accordingly, the Court can rest assured that Milberg Weiss will similarly be capable of harmonizing the efforts of all counsel involved in this litigation. In addition, because it represents the movants with the largest financial interest in the PSLRA Claims, as demonstrated above, Milberg Weiss is strongly motivated to ensure that all of the Massachusetts Actions, which are founded on common factual allegations, proceed efficiently and in lock-step. Accordingly, the Court should approve the MFS Funds Lead Plaintiff Movants' selection of Milberg Weiss as Coordinating Counsel.

## CONCLUSION

For all the foregoing reasons, Movants respectfully request that the Court: (i) consolidate the Massachusetts Actions; (ii) appoint the MFS Funds Lead Plaintiff Movants as Lead Plaintiff pursuant to the PSLRA with respect to the Massachusetts PSLRA Claims; (iii) approve the MFS Funds Lead Plaintiff Movants' designation of a steering committee comprised of class members Lauren Taylor, as trustee of the French & Associates 401(K) Profit Sharing Plan, Curt Conklin, Oliver S. Trone, individually, and as trustee of the Trone Advertising Inc. 401(K) Plan, and Aureliano Vignati to represent the MFS Funds Lead Plaintiff Movants as Lead Plaintiff; (iv) approve the MFS Funds Lead Plaintiff Movants' selection of Milberg Weiss, pursuant to the PSLRA, as Lead Counsel of the PSLRA Claims; and appoint Milberg Weiss as Coordinating Counsel with respect to the Massachusetts Claims; and (v) approve the MFS Funds Lead Plaintiff Movants' selection of Moulton & Gans as Liaison Counsel or the Class.

DATED:  February 9, 2004

Respectfully submitted,

**MOULTON & GANS, P.C.**

By:

By: Nancy Freeman Gans

Nancy Freeman Gans
33 Broad Street, Suite 1100
Boston, MA  02109
Telephone:  (617) 369-7979

*Proposed Liaison Counsel*

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
Melvyn I. Weiss
Steven G. Schulman
Peter E. Seidman
Andrei V. Rado
Sharon M. Lee
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone:  (212) 594-5300

*Proposed Lead Counsel and Coordinating
Counsel for the Class*

**LAW OFFICE OF
ALFRED G. YATES, JR. P.C.**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219-1649
Telephone:  (412) 391-5164

**LAW OFFICES OF CHARLES J. PIVEN,
P.A.**
Charles J. Piven
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland  21202
Telephone:  (410) 986-0036

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was
served upon the attorney of record for each party
by mail (by hand) on 2/9/04 .

20

**RABIN MURRAY & FRANK, LLP**
Brian Murray
Eric J. Belfi
275 Madison Avenue
New York, NY 10016
(212) 682-1818
(212) 682-1892

**GLANCY & BINKOW LLP**
Lionel Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
(310) 201-9150

*Plaintiffs' Counsel*